ACCEPTED
03-14-00735-CV
5094254
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/30/2015 9:29:42 AM
JEFFREY D. KYLE
CLERK

**No. 03-14-00735-CV**

IN THE
THIRD COURT OF APPEALS
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

4/30/2015 9:29:42 AM

JEFFREY D. KYLE
Clerk

**Entergy Texas, Inc., et al.,**
**Appellants**

**v.**

**Public Utility Commission of Texas, et al.,**
**Appellees**

*Appeal from the 353rd Judicial District Court, Travis County, Texas*
*The Honorable John K. Dietz, Judge Presiding*

_____

**ENTERGY TEXAS, INC.'S RESPONSE BRIEF**
_____

John F. Williams
State Bar No. 21554100
jwilliams@dwmrlaw.com
Marnie A. McCormick
State Bar No. 00794264
mmccormick@dwmrlaw.com
DUGGINS WREN MANN & ROMERO, LLP
600 Congress Ave., Ste. 1900 (78701)
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 *fax*

ATTORNEYS FOR
ENTERGY TEXAS, INC.

April 2015

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

INDEX OF AUTHORITIES........................................................................................ iii

FUEL COSTS ...............................................................................................................1

I.   STATEMENT OF FACTS ...................................................................................1

II.  SUMMARY OF ARGUMENT.............................................................................7

III. ARGUMENT AND AUTHORITIES ...................................................................8

    A.   The Commission's rules require symmetry in the allocation of
         estimated and actual, incurred fuel costs...............................................8

    B.   These rules do not require use of a "contemporaneous" line loss
         study in reconciling fuel costs.................................................................9

    C.   The Commission has no discretion to ignore these rules.....................11

    D.   These rules apply to this case................................................................11

    E.   The provisions the Commission relies upon in its decision do
         not justify its action.............................................................................14

    F.   The additional provision the Attorney General cites does not
         support the Commission's decision either. ..........................................17

    G.   The Commission's decision has unjust consequences..........................19

    H.   ETI is harmed by the Commission's error. ..........................................21

STORM COSTS ........................................................................................................24

I.   STATEMENT OF FACTS ................................................................................24

II.  SUMMARY OF ARGUMENT...........................................................................28

III. ARGUMENT AND AUTHORITIES .................................................................30

    A.   The Commission did not address the prudence of ETI's 1997
         ice storm restoration costs in Docket No. 18249. ...............................31

B.   The Commission's decision in this case is supported by substantial evidence.................................................................36

1.   The Commission has formulated its own burden-shifting analysis for prudence reviews. ...................................37

2.   This Court may not second-guess the Commission's assessment of the weight of the evidence. ................................38

3.   The record amply supports the reasonableness and necessity of ETI's costs of restoring its system after the 1997 ice storm. ........................................................39

   a.   The Commission reasonably found that ETI made a *prima facie* case of prudence. ......................................39

   b.   The Commission reasonably declined to make the disallowances that OPUC proposed. ..............................42

   c.   *Conditional Cross-Point*:  The Commission erred as a matter of law in denying ETI's request to admit a comprehensive spreadsheet of historical storm restoration costs in evidence.................................45

CONCLUSION AND PRAYER ........................................................47

CERTIFICATE OF COMPLIANCE..................................................48

CERTIFICATE OF SERVICE .........................................................48

# INDEX OF AUTHORITIES

**Cases**

*Atmos Energy Corp. v. Cities of Allen*,
  353 S.W.3d 156 (Tex. 2011) ..............................................................................21

*CenterPoint Energy Entex v. Railroad Comm'n of Tex.*,
  208 S.W.3d 608 (Tex. App. – Austin 2006, pet. dismissed)................................21

*CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*,
  263 S.W.3d 448 (Tex. App. – Austin 2008), *aff'd sub nom.,*
  *Texas Indus. Energy Consumers v. CenterPoint Energy Houston Elec.,*
  *LLC*, 324 S.W.3d 95 (Tex. 2009) ......................................................................16

*Central Power & Light Co. v. Public Util. Comm'n of Tex.,*
  36 S.W.3d 547 (Tex. App. – Austin 2000, pet. denied)......................................39

*Duval County Ranch Co. v. State*,
  587 S.W.2d 436 (Tex. Civ. App. – San Antonio 1979, writ ref'd n.r.e.),
  *cert denied,* 101 S.Ct. 856 (1981) ....................................................................39

*El Paso Elec. Co. v. Public Util. Comm'n of Tex.,*
  917 S.W.2d 846 (Tex. App. – Austin 1995, writ dism'd by agr.)
  (citing *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816 (Tex. 1984)) ... 34, 35

*Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.,*
  112 S.W.3d 208 (Tex. App. – Austin 2003, pet. denied)............................ 37, 38

*Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.*,
  173 S.W.3d 199 (Tex. App. – Austin 2005, pet. denied)..................................2, 3

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .........................................................................................16

*Flores v. Employees Retirement Sys. of Tex.,*
  74 S.W.3d 532 (Tex. App. – Austin 2002, pet. denied)......................................11

*Gilmore v. State,*
  744 S.W.2d 630 (Tex. App. – Dallas 1987, pet. ref'd) ................................ 46, 47

*Keystone Operating Co. v. Runge Indep. Sch. Dist.*,
  558 S.W.2d 82 (Tex. Civ. App. - San Antonio 1977, writ ref'd n. r. e.)..............39

*Nall v. Plunkett,*
  404 S.W.3d 552 (Tex. 2013) .............................................................................27

*Oncor Elec. Delivery Co. LLC v. Public Util. Comm'n of Tex.,*
  406 S.W.3d 253 (Tex. App. – Austin 2013, no pet.) ..........................................11

*Railroad Comm'n of Tex. v. High Plains Natural Gas Co.*,
   628 S.W.2d 753 (Tex. 1981) ...............................................................................20

*Texas Alarm & Signal Ass'n v. Public Util. Comm'n of Tex.*,
   603 S.W.2d 766 (Tex. 1980) ...............................................................................11

*Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*,
   665 S.W.2d 446 (Tex. 1984) ...............................................................................39

*Texas Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC*,
   324 S.W.3d 95 (Tex. 2010) .................................................................................17

*TGS-NOPEC Geophysical Co. v. Combs*,
   340 S.W.3d 432 (Tex. 2011) ........................................................................ 11, 16

**Statutes**

Tex. Gov't Code Ann. § 2001.174 .................................................................... 21, 23

Tex. Util. Code Ann. § 36.051 ..............................................................................19

Tex. Util. Code Ann. § 36.064 ..............................................................................24

Tex. Util. Code Ann. § 36.111 ..............................................................................21

Tex. Util. Code Ann. § 36.203 ...................................................................... 1, 3, 19

**Rules**

16 Tex. Admin. Code § 25.231 ........................................................................ 24, 25

16 Tex. Admin. Code § 25.235 ................................................................................1

16 Tex. Admin. Code § 25.236 ....................................................................... *passim*

16 Tex. Admin. Code § 25.237 ....................................................................... *passim*

**Administrative Cases**

*Application of Entergy Gulf States Utils. Co. for Authority to Change Rates;*
   *Inquiry of the Public Util. Comm'n of Tex. into the Prudence and*
   *Efficiency of the Planning & Management of the River Bend Nuclear*
   *Generating Station,* Docket Nos. 7195 & 6755 ..................................................37

*Application of Entergy Gulf States, Inc. for Approval of its Transition to*
   *Competition Plan and the Tariffs Implementing the Plan, and for the*
   *Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to*
   *Recover a Surcharge for Unrecovered Fuel Costs,* Docket No. 16705 ...............34

*Application of Entergy Gulf States, Inc. to Revise Fuel Factor Formula*,
    Docket No. 32915......................................................................................10

*Application of Texas Utils. Elec. Co. for Authority to Change Rates,* Docket
    No. 9300 .......................................................................... 37, 38

*Entergy Gulf States, Inc. Service Quality Issues Severed From Docket No.*
    *16705*, Docket No. 18249..................................................................31

**TO THE HONORABLE THIRD COURT OF APPEALS:**

The appeals of the district court's judgment brought by the Public Utility Commission of Texas (the "Commission") and Office of Public Utility Counsel ("OPUC") concern different types of expense that Entergy Texas, Inc. ("ETI") incurs to serve its customers. The Commission's challenge concerns fuel costs, and OPUC's challenge concerns storm restoration costs. Because these two parties' arguments are wholly unrelated, ETI will for the Court's convenience address each party's appeal separately.

## FUEL COSTS

## I. STATEMENT OF FACTS

A utility's cost of procuring fuel and purchased energy[1] are collectively referred to in Commission Rule 25.235 as "fuel costs." *See* 16 Tex. Admin. Code § 25.235. Electric utility rates include a "fuel factor," which governs the amount of money the utility may initially charge customers in each class to reimburse the utility for its known and projected fuel costs. *See* Tex. Util. Code Ann. § 36.203; *Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.*, 173 S.W.3d 199, 206

---

[1] Generally speaking, the cost of electricity purchased from third parties has two elements: energy and capacity. Energy payments allow the seller to recover the fuel-related cost of supplying the electricity, while capacity payments allow the seller to recover the investment and other fixed costs associated with the power plants used to supply the electricity. *See City of El Paso v. Public Util. Comm'n of Tex.,* 344 S.W.3d 609, 614 (Tex. App. – Austin 2011, no pet.). Unlike the energy component of purchased power, the capacity component is included in base rates and not recoverable as a fuel expense. *See* 16 Tex. Admin. Code § 25.236(a)(6); *City of El Paso,* 344 S.W.3d at 614.

1

(Tex. App. – Austin 2005, pet. denied). In setting a fuel factor, the Commission evaluates the utility's evidence of what these costs are projected to be. *See* 16 Tex. Admin. Code §§ 25.236(a) & .237(c). Costs are allocated among various customer classes, and a billing factor is set for each class. That is, customers in each class are assigned an amount per kWh of electricity consumed that represents their share of the utility's estimated fuel expense.

The fuel factors for various customer classes are not necessarily the same. One reason for this is that fuel factors account for "line losses." Some of the power put into the system is lost off of the transmission and distribution wires, transformers, and other facilities before it gets to the customer's meter. The amount of power lost varies across different voltage facilities on the system. It also varies dramatically as load fluctuates, increasing exponentially as load increases. "Line loss studies" determine the average line losses experienced at each voltage level on the system. They allocate those losses among customer classes based upon the various voltage levels of customers in each class.[2] The purpose of this allocation is to make customers, who are billed for energy at the meter, responsible for their average share of the estimated costs that are incurred before line losses occur.[3]

---

[2] AR Part II, Binder 9, Cities Exh.6 (Nalepa Direct at 43).
[3] *Id.* at 44.

2

Because actual fuel costs may vary dramatically from the estimates upon which the fuel factors were set, the regulatory lag associated with traditional ratemaking can have a dramatic financial impact on the utility in the context of fuel costs. Recognizing this, the legislature ordered the Commission to devise a process by which an electric utility's revenues under its fuel factor may "timely" be reconciled, after the fact, on a dollar-for-dollar basis with the utility's actual, reasonable, and necessary fuel expenses. *E.g., Entergy Gulf States, Inc.*, 173 S.W.3d at 206; Tex. Util. Code Ann. § 36.203(e). The Commission has adopted rules governing the setting of fuel factors and the reconciliation of fuel costs. Under these rules, revenues collected through the fuel factor are periodically reconciled with the utility's actual, reasonable costs. Amounts over or under the actual reasonable costs may be refunded or surcharged to customers or may be carried forward to offset future refunds or surcharges. *See* 16 Tex. Admin. Code §§ 25.236(e) & .237(a)(3)(B).

As required by Commission rule, ETI sought in the underlying rate case to reconcile its past fuel costs and revenues for the period July 1, 2009, through June 30, 2011. *See* 16 Tex. Admin. Code § 25.236(b). The fuel factors in effect and used to bill customers during this historical period incorporated the results of a 1997 line loss study approved by the Commission in Docket No. 19834.[4] As part

---

[4] AR Part II, Binder 9, Cities Exh.6 (Nalepa Direct at 44).

3

of its filing in this underlying proceeding, ETI quantified the revenues collected through the fuel factors approved for use during the reconciliation period. ETI also quantified its actual fuel costs for the same time period using the same allocation factors that were approved for use and actually used during the reconciliation period.

ETI determined it had over-recovered its fuel costs during the reconciliation period and quantified the over-recovery, including interest, at $243,339,353.[5] ETI established that it had already refunded $237,686,760 of that amount in accordance with interim Commission orders.[6] ETI proposed to roll the remaining over-recovery of about $5.6 million into the Company's fuel recovery balance, to be addressed in the next fuel reconciliation proceeding.[7]

No party challenged the way ETI allocated projected costs under the fuel factors that were approved for use in the reconciliation period. Nor did any party challenge the reasonableness or necessity of the fuel costs actually incurred for the reconciliation period. Intervenor Cities, however, challenged the way ETI allocated its incurred fuel costs among customer classes. Cities argued that ETI should not have allocated its incurred costs using the line loss study that was approved for use when projected fuel costs were billed. Instead, Cities argued ETI

---

[5] AR Part II, Binder 32, ETI Exh. 11 (McCloskey Direct at 2).
[6] *Id.* at 8-9. The Attorney General fails to acknowledge this fact in its brief, intimating that none of the $243 million has been refunded to customers. *See* PUCT's Appellant's Brief at 4.
[7] AR Part II, Binder 32, ETI Exh. 11 (McCloskey Direct at 9).

4

should have allocated incurred costs using a different study that ETI presented for the first time in this case for use in *future* fuel factors and reconciliations.[8] Cities witness Nalepa argued ETI should be required to use the 2010 line loss study not only on a going-forward basis, but also to retroactively allocate fuel costs for the *historical* reconciliation period. According to Mr. Nalepa, using the 2010 line loss study instead of the 1997 study reduces the fuel expenses allocated to Texas retail customers by $3,981,271 for the reconciliation period.[9] Mr. Nalepa contended that amount should be allocated to wholesale customers under the 2010 line loss study.[10]

The four administrative law judges ("ALJs") who authored the proposal for decision recommended that the Commission reject Cities' proposed adjustment.[11] The ALJs concluded that in a fuel reconciliation proceeding, Commission rules require the use of Commission-approved line loss factors that were in effect at the time fuel costs were billed to customers.[12] The ALJs pointed out that allocating reconcilable fuel costs using a line loss study approved at the same time the fuel factor is set ensures that actual fuel costs are allocated among customer classes

[8] *See* AR Part II, Binder 32, ETI Exh. 58 (McCloskey Rebuttal at 3-4); *see also* AR Part I, Binder 7, Item 244 (Order on Rehearing at 9).
[9] *See* AR Part II, Binder 9, Cities Exh. 6 (Nalepa Direct at 47).
[10] *Id.* at 46-47.
[11] AR Part I, Binder 5, Item 185 (Proposal for Decision at 328).
[12] *Id.*

consistently with the way the costs were billed to customer classes.[13] The ALJs noted that if an updated line loss study is used to allocate fuel costs in the fuel reconciliation, a mismatch results with the amounts collected under the fuel factor from various customer classes.[14]

The Commission disagreed with the ALJs' recommendation and determined that ETI should have used its 2010 line-loss study to allocate fuel costs among customer classes for the historical reconciliation period. The Commission found:

> FOF 246A: ETI's 2010 line-loss factors should be used to reconcile ETI's fuel costs. Therefore, ETI's fuel reconciliation over-recovery should be reduced [sic; should read "increased"] by $3,981,271.[15]

The Commission offered sparse reasoning for its decision:

> COL 19A: Fuel factors under P.U.C. Subst. R. 25.237(a)(3) are temporary rates subject to revision in a reconciliation proceeding.

> COL 19B: P.U.C. Subst. R. 25.236(d)(2) defines the scope of a fuel reconciliation proceeding to include any issue related to the reasonableness of a utility's fuel expenses and whether the utility has over- or under-recovered its reasonable fuel expenses. It is proper to use the new line-loss study to calculate Entergy's fuel reconciliation and over-recovery.[16]

---

[13] *Id.*
[14] *Id.*
[15] AR Binder 7, Item 244 (Order on Rehearing at 9 and FOF 246A).
[16] *Id.* at 9 and COLs 19A & 19B.

ETI sought judicial review of this decision.[17]  The district court reversed the Commission's decision, finding that using the 2010 line loss study instead of the prior-approved line loss study violates Commission Rules 25.236(e)(3) and 25.237(a) and (c)(2)(B).[18]

## II.  SUMMARY OF ARGUMENT

The Commission's use of different line loss studies to allocate ETI's fuel factor charges and its reconcilable fuel costs among customer classes violates the Commission's administrative rules governing the recovery of fuel costs.  The rules expressly require symmetry in the allocation of fuel factor charges and actual, incurred fuel costs.  They do not contemplate or authorize the use of a "contemporaneous" line loss study to reconcile fuel costs.  The provisions that generally govern the scope of fuel factor and fuel reconciliation proceedings, upon which the Commission relies, do not speak to the allocation of fuel factor charges or reconcilable costs.  The Commission's interpretation of those provisions in this case creates a conflict among rules where none exists, in contravention of the well-established rules of construction.  The interpretation also creates an absurd, inequitable regulatory scheme under which utilities cannot mitigate their risk of under-recovering fuel costs.  The record shows that the Commission's erroneous interpretation of its rules in this case has stranded almost $4 million of fuel costs

---

[17] CR 5.
[18] CR 2118.

7

that the Commission itself found were reasonably and necessarily incurred to serve retail customers.  The district court properly reversed the Commission's decision on this issue.

## III.  ARGUMENT AND AUTHORITIES

The district court correctly determined that the Commission, by creating a mismatch between the way estimated costs and actual, incurred costs were allocated among customer classes, violated its own rules.

### A.  The Commission's rules require symmetry in the allocation of estimated and actual, incurred fuel costs.

Commission Rule 25.237 requires a utility to bill estimated fuel costs via a fuel factor that incorporates loss factors pre-approved by the Commission. Specifically:

- Rule 25.237(a) requires fuel costs to be recovered from customers "by the use of a fuel factor."  16 Tex. Admin. Code § 25.237(a);

- Rule 25.237(a)(1) requires fuel factors to account for the difference in line losses among customer classes.  *Id*. § 25.237(a)(1); and

- Rule 25.237(c)(2)(B) requires the line loss adjustments incorporated into fuel factors to be approved by the Commission prior to their use on a prospective basis.  *Id*. § 25.237(c)(2)(B).

Commission Rule 25.236 requires the utility's actual fuel costs to be reconciled with revenues collected under the fuel factors, using the same line loss adjustments

8

that were approved for use at the time the costs were incurred.  *Id*. § 25.236(e)(3).

Rule 25.236(e)(3), regarding calculation of adjustments resulting from the reconciliation process, states:

> Interclass allocations of refunds and surcharges … shall be … adjusted for line losses *using the same commission-approved loss factors that were used in the electric utility's applicable fixed or interim fuel factor.*

16 Tex. Admin. Code § 25.236(e)(3) (emphasis added).

These provisions preclude the Commission from using line loss factors in a final reconciliation that differ from those approved for billing under the fuel factor during the reconciliation period.  Every place that loss factors are mentioned, whether in the context of fuel factors or fuel reconciliation, the rules require use of the loss factors that were approved for use when the costs were charged. Nevertheless, the Commission here ordered one line loss study to be used to allocate costs while they were being collected and another, as-yet-unapproved study to allocate costs after the fact.  The Commission simply ignored the plain, unambiguous language in its rules requiring line loss factors to be applied consistently throughout a given reconciliation period.

**B.      These rules do not require use of a "contemporaneous" line loss study in reconciling fuel costs.**

The Attorney General emphasizes that the study used to allocate losses during the reconciliation period was conducted in 1997 even though a new one

became available in 2010. However, the Commission many times over the last decade has set the Company's fuel factors -- and authorized fuel refunds -- using the 1997 line loss study.[19] In fact, ETI over the years has proposed new line loss factors, but the Commission never approved them.[20]

More importantly, the Commission's rules do not require a line loss study to be updated with any particular frequency, much less be contemporaneous with a reconciliation period. Under the Commission's rules, the Commission-approved loss factors incorporated in the fuel factor determine how much of a utility's fuel costs will be allocated to retail versus wholesale customer classes. Retail customer classes might or might not benefit from an after-the-fact change to the line loss factors, depending on the outcome of the new study. The Commission's rules inherently accept the risk of such differences, and disadvantage no class of customers, by requiring that fuel costs be billed and reconciled using the same set of Commission-approved loss factors, without regard to the vintage of the underlying line loss study.

---

[19] AR Part II, Binder 32, ETI Exh. 11 (McCloskey Direct at 8); AR Part II, Binder 32, ETI Exh. 58 (McCloskey Rebuttal at 2 of 4); *see also Application of Entergy Gulf States, Inc. to Revise Fuel Factor Formula*, Docket No. 32915 (Sept. 8, 2006 Order at FOF 15(e)). Filings in PUCT dockets may be accessed at:
 http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgSearch.asp.
The "Control Number" for each case is its docket number.
[20] AR Part II, Binder 32, ETI Exh. 58 (McCloskey Rebuttal at 2 of 4).

10

**C.     The Commission has no discretion to ignore these rules.**

Because the Commission's rules require this result, the Commission has no discretion to apply them differently.  It is true that the Commission, generally speaking, has broad discretion in allocating the utility's revenue requirement among customer classes.  *See Texas Alarm & Signal Ass'n v. Public Util. Comm'n of Tex.,* 603 S.W.2d 766, 772-73 (Tex. 1980).  However, the Commission has adopted rules specifying exactly how loss factors will be utilized to allocate fuel costs among customer classes.  The Commission is bound to follow its own rules. *E.g., Flores v.  Employees Retirement Sys. of Tex.,* 74 S.W.3d 532, 542 (Tex. App. – Austin 2002, pet. denied).  When the language of the rule is not ambiguous, the agency's contrary interpretation is entitled to no deference.  *E.g., TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex. 2011); *Oncor Elec. Delivery Co. LLC v. Public Util. Comm'n of Tex.,* 406 S.W.3d 253, 270 (Tex. App. – Austin 2013, no pet.).  Because the Commission's decision violates the plain language of its rules, the decision was properly reversed.

**D.     These rules apply to this case.**

The Attorney General incorrectly contends that the rules discussed above do not apply to this fuel reconciliation.  First, the Attorney General argues that the provisions of Rule 25.237 do not apply because they are about setting fuel factors, not reconciling actual fuel costs.  But subsection 25.236(e)(3) of the fuel

11

reconciliation rule renders the applicable fuel factors material to the reconciliation itself. It expressly requires the Commission in a reconciliation to use "the same commission-approved loss factors that were used in the electric utility's applicable fixed or interim *fuel factor*." 16 Tex. Admin. Code § 25.236(e)(3) (emphasis added). Neither the fuel factors nor the provisions of Rule 25.237 become irrelevant after fuel factors are set.

The Attorney General argues that subsection 25.236(e)(3) of the fuel reconciliation rule does not apply for two reasons. First, the Attorney General points out that the provision refers to "refunds and surcharges." Ignoring that ETI has, with the Commission's permission, already refunded hundreds of millions of dollars based upon the loss factors incorporated in ETI's fuel factors, the Attorney General emphasizes that ETI did not ask to refund its remaining fuel over-recovery in this proceeding. Instead, ETI asked to carry the as-yet-unrefunded portion of its fuel balance forward to be addressed in the next reconciliation proceeding. That fact does not render subsection 25.236(e)(3) inapplicable.

Subsection 25.236(e) does not apply only when a utility seeks permission to pass a fuel over- or under-recovery through to customers on their bills. The provision imposes requirements that apply to utilities at all times. For example, subsection (e)(1) requires utilities to keep a cumulative total of fuel over- or under-recoveries on a monthly basis. *See* 16 Tex. Admin. Code § 25.236(e)(1). Interest

12

must accrue on those totals on a monthly basis and must be compounded annually. *Id.* § 25.236(e)(1)(A) & (C). Subsection (e)(3) similarly requires that allocations of refunds and surcharges (including interest) among customer classes must be "*developed* on a month-by-month basis." *Id.* § 25.236(e)(3) (emphasis added). This is the same provision that expressly requires reconciliation adjustments to be made using the same line loss factors incorporated into the fuel factors used during the reconciliation period. The provision applies all the time, not just when a utility seeks permission to zero-out its fuel balance.

Moreover, the fuel balance that ETI sought to quantify in this proceeding is effectively a "refund" to customer classes because it is the starting place for ETI's fuel balances going forward. Once a fuel reconciliation is complete, retail customer classes have the benefit of any dollars they overpaid in the past, just as if they had been refunded on individual customer bills. The Attorney General's suggestion that reconciliations should be handled differently depending upon whether refunds are carried forward or passed through to customer bills finds no support in the rules and makes no sense.

The Attorney General also argues that subsection 25.236(e)(3) does not apply to this case because it pertains to the allocation of fuel costs among retail classes only, not wholesale classes. This argument does not support the Commission's decision for several reasons. First, the allocation of fuel costs

13

among retail and wholesale classes are inextricably intertwined. That is, whatever fuel costs are not allocated to retail classes are necessarily allocated to wholesale customers. Second, the language of the rule does not support the Attorney General's argument. In fact, subsection (e) says that the term "rate class" means "all customers taking service under the same tariffed rate schedule, or a group of seasonal agricultural customers as identified by the electric utility." *Id.* § 25.236(e)(2). Both retail and wholesale customers take service under tariffed rate schedules. Regardless, the Attorney General acknowledges that the rule "applies to the classes of customers included in Fuel-Factor rates that the Commission set."[21] For those customer classes, the rule clearly requires the Commission to "develop" refunds and surcharges using the same loss factors that were incorporated into the fuel factors for the reconciliation period. That is exactly how ETI asked the Commission to reconcile its fuel revenues and costs and set fuel balances for the future. It is also exactly what the Commission did not do.

### E. The provisions the Commission relies upon in its decision do not justify its action.

Instead of acknowledging the plain meaning of subsection 25.236(e)(3), which is dispositive of this issue, the Commission cited two other provisions in its order: subsections 25.237(a)(3) and 25.236(d)(2).

---

[21] *See* PUCT's Appellant's Brief at 15.

14

Subsection 25.237(a)(3) recognizes that a utility's collection of revenues under a fuel factor is "temporary" and subject to certain "adjustments." *See id.* § 25.237(a)(3). However, the provision enumerates only two types of adjustment. First, it contemplates that the Commission may "disallow" costs that it determines the utility should not have incurred in the first place. *Id.* § 25.237(a)(3)(A). Second, the provision contemplates adjustments to the extent there are variations between the costs prudently incurred and the revenues collected over the reconciliation period. That is, if the utility collects more or less than its actual, prudently-incurred fuel costs, the over- or under-collection is quantified and adjusted as appropriate. *Id.* § 25.237(a)(3)(B).

Subsection 25.236(d)(2) similarly reads, "[t]he scope of a fuel reconciliation proceeding includes any issue related to determining the reasonableness of the electric utility's fuel expenses during the reconciliation period and whether the electric utility has over- or under-recovered its reasonable fuel expenses." *Id.* § 25.236(d)(2). These are the very same issues enumerated in subsection 25.237(a)(3).

Neither of these provisions supports the Commission's decision here. The Commission did not find that any of ETI's fuel costs were imprudently incurred.[22] And all parties agreed that ETI over-recovered those costs under the fuel factor that

---

[22] AR Part I, Binder 5, Item 185 (Proposal For Decision at 321-29); AR Part I, Binder 7, Item 244 (Order on Rehearing at 9).

was in effect during the reconciliation period. Nevertheless, the Commission contends that subsections 25.236(d)(2) and 25.237(a)(3) authorize it, in the context of a fuel reconciliation proceeding, to change the way the fuel costs were allocated to customer classes during the reconciliation period. The plain language of the provisions does not support that conclusion. Neither provision says anything about how costs are allocated among customer classes.

Interpreting subsection 25.236(d)(2) and 25.237(a)(3) the way the Commission did here creates a direct conflict between those provisions and subsection 25.236(e)(3), contrary to applicable rules of construction. Agency rules are interpreted in accordance with the same rules that apply to statutory construction. *E.g., TGS-NOPEC Geophysical Co.*, 340 S.W.3d at 438. Those principles require that provisions relating to the same subject matter be read in harmony if at all possible. As the U.S. Supreme Court has noted:

> It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'"

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see also CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 263 S.W.3d 448, 461 (Tex. App. – Austin 2008), *aff'd sub nom., Texas Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC*, 324 S.W.3d 95 (Tex.

16

2009). Moreover, when provisions cannot be reconciled, the specific controls over the general. *E.g., Texas Indus. Energy Consumers v. CenterPoint Energy Houston Electric, LLC,* 324 S.W.3d 95, 107 (Tex. 2010). All the provisions discussed above work in harmony, and the specific language of subsection 25.236(e)(3) has full effect, when the Commission uses the same pre-approved line loss study to allocate revenues under a fuel factor and to allocate over- and under-collections in a corresponding reconciliation. The Commission's application of these rules to create a mismatch between the way fuel costs are billed and reconciled, on the other hand, violates the well-established principles of interpretation for administrative rules.

## F. The additional provision the Attorney General cites does not support the Commission's decision either.

The Attorney General cites a different rule provision, not relied upon by the Commission, in an attempt to justify the Commission's decision. Specifically, the Attorney General cites subsection 25.236(d)(1)(A), which clarifies that the utility in a reconciliation proceeding has the burden of proving the reasonable and necessary fuel expenses of serving "retail" customers. *See* 16 Tex. Admin. Code § 25.236(d)(1)(A). According to the Attorney General, this provision authorizes the Commission to disregard an "out-of-date line-loss study" and rely upon a "contemporaneous" one to adjust allocations among retail and wholesale classes.

17

Again, subsection 25.236(e)(3) expressly requires the Commission to develop fuel reconciliation adjustments using the very same loss factors that are incorporated in the applicable fuel factor. Neither subsection 25.236(d)(1)(A) nor any other Commission rule contradicts this mandate for allocating fuel costs among customer classes at the reconciliation stage. The Attorney General's argument creates a direct conflict between two rules instead of harmonizing them.

More important, the Commission's order belies the Attorney General's argument that the Commission found that the $4 million at issue here was not reasonably or necessarily incurred to serve retail customers. The Commission expressly found:

214. ETI incurred $616,248,686 in natural-gas expenses during the reconciliation period, which is from July 2009 through June 2011.

*** 

217. ETI's natural gas expenses were reasonable and necessary expenses incurred to provide reliable electric service to *retail* customers.

218. ETI incurred $90,821,317 in coal expenses during the reconciliation period.

*** 

221. ETI's coal expenses were reasonable and necessary expenses incurred to provide reliable electric service to *retail* customers.

222. ETI incurred $990,041,434 in purchased-energy expenses during the reconciliation period.

*** 

18

225. ETI's purchased-energy expenses were reasonable and necessary expenses incurred to provide reliable electric service to *retail* customers.[23]

The Commission expressly concluded:

17. ETI has demonstrated that its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to *retail* customers *as required by P.U.C. Subst. R. 25.236(d)(1)(A)….*[24]

Whatever the Commission's reason was for allocating fuel costs under the 2010 line loss study, it was not a belief that subsection 25.236(d)(1)(A) required it.

## G. The Commission's decision has unjust consequences.

The Commission has applied its rules in a manner that thwarts the legislature's purpose and results in an inequitable outcome. The legislature has directed the Commission not only to enable utilities to recover their reasonably incurred expenses, but also to implement procedures that provide for the timely adjustment of a utility's fuel factor and reconciliation of a utility's fuel expenses. *See* Tex. Util. Code Ann. §§ 36.051 & 36.203(b) & (e). The legislature clearly intended utilities to recover their reasonable and necessary fuel expenses, and on a timely basis.

Here, no party challenged the prudence of ETI's fuel costs. Neither the ALJ nor the Commission recommended or adopted a single prudence-based

---

[23] AR Part I, Binder 7, Item 244 (Order on Rehearing at FOFs 214, 217, 218, 221, 222, & 225) (emphasis added).

[24] *Id.* at COL 17 (emphasis added).

19

disallowance in this proceeding. Indeed, as noted above, the Commission expressly found that ETI reasonably incurred the fuel costs at issue to serve retail customers. Nevertheless, the Commission has disallowed some $4 million of these very expenses. To deny the Company full recovery of these costs constitutes error of law and is arbitrary and capricious. *See Railroad Comm'n of Tex. v. High Plains Natural Gas Co*., 628 S.W.2d 753 (Tex. 1981) (per curiam) (agency must structure system that permits utility to recover all of its prudently-incurred fuel expenses).

The Commission has created a fundamentally unfair regulatory scheme. Under the Commission's decision, the utility has to collect money from customers using one set of loss factors, but it is anyone's guess whether the Commission will use those same factors when reconciling costs with revenues. If not, the resulting mismatch between revenues and costs may not always favor the same class of customers, but it will always create winners and losers among customer classes with regard to cost allocation. Additionally, the approach provides no means for the Company to ensure that it is using appropriate loss factors until after the fact, when it is too late to change them. The only way the Company could mitigate this regulatory risk would be to unilaterally apply *un*approved loss factors while it is collecting fuel costs. That is not a viable option because, as noted above, a Commission rule requires ETI to use Commission-*approved* loss factors when

20

collecting fuel revenues.  *See* 16 Tex. Admin. Code § 25.237(a)(1)(B) & (c)(2)(B).

Moreover, the use of unapproved loss factors to collect under the fuel factor would violate the filed rate doctrine codified in PURA.  *See* Tex. Util. Code Ann. § 36.111(b).[25]  Surely the Commission would not advocate that approach.

Regardless, the Commission must interpret and apply its rules to further their purpose and to avoid absurd consequences.  *E.g., Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 160 (Tex. 2011).  The Commission's decision here violates this fundamental principle.

**H.    ETI is harmed by the Commission's error.**

The Attorney General contends that ETI did not prove that the Commission's order causes ETI harm, and suggests ETI may be able to retroactively recover the $4 million from wholesale customers.  The Commission did not make any such finding.  Again, this Court may not decide fact issues the Commission did not decide.  Tex. Gov't Code Ann. § 2001.174(1).

Moreover, the record shows that the costs are stranded.  Company witness Myra Talkington testified that:

> Q:    Okay.  Now, Mr. Nalepa testifies that if you do update the line
>        losses and use them in the reconciliation period, three point --
>        as I said, 3.98 million would be allocated to wholesale.  It

---

[25] The "filed rate doctrine" permits a utility to charge only the rates prescribed in the approved tariffs on file with the Commission.  *E.g., CenterPoint Energy Entex v. Railroad Comm'n of Tex.,* 208 S.W.3d 608, 621 (Tex. App. – Austin 2006, pet. dismissed).

21

> wouldn't be incurred by the company.  Right?  It wouldn't be like a disallowance.  Is that right?
>
> A:    Are you talking about historical fuel costs?
>
> Q:    Yes.
>
> A:    Again, you're going outside my expertise, but if you are retrospectively changing an allocation factor, then, to me, no, you're stranding those costs.[26]
>
> ***
>
> Q:    You also had a question from Mr. Mack regarding -- with regard to the line losses, something along the lines that if the company or someone could reallocate the line losses retroactively you used the word "stranded," those would result in stranded costs?
>
> A:    I did.
>
> Q:    Why would the costs become stranded?
>
> A:    If you retroactively change an allocation factor and you don't have the ability to go back and recover those costs from anyone else, then the costs are stranded.  If it in fact allocates less amount to one party or another and you're only changing one side of the equation, then it would not necessarily allow you to recover all your costs.
>
> Q:    And so what do you -- by stranded -- well, let me -- can you explain what you mean -- what does the word "stranded" mean to you?
>
> A:    It means that they would be costs the company incurred that they would not be able to recover.[27]

Nothing in the record contradicts this testimony.

---

[26] AR Part III, Binder 43, Vol. I (May 1, 2012, Transcript at 1470-71).

[27] *Id.* at 1484.

22

Even if there were some theoretical mechanism by which ETI could have attempted to retroactively reallocate line losses to past wholesale customers, ETI was reasonable in relying on the expectation that the Commission would continue to follow its own rules in accordance with Texas law. The Administrative Procedure Act ("APA") does not require a party to prove that it has no opportunity to mitigate the harmful effects of an agency's order. The APA provision the Commission relies upon simply precludes a court from reversing an agency's error if it, in and of itself, does not adversely affect the complaining party. *See* Tex. Gov't Code Ann. § 2001.174(2).

The Commission's argument is particularly troubling in light of the fact that the harm ETI has suffered is the result of the Commission's own conduct preceding this case. That is, ETI made its wholesale deals and conducted its business in reliance upon the Commission's continued approval of the 1997 line-loss study in fuel factor and fuel refund proceedings. ETI simply asked the Commission to adhere to its *own* regulatory scheme, upon which Entergy reasonably relied to its detriment. The district court properly reversed the Commission on this issue.

## I. STATEMENT OF FACTS

Another significant, recurring expense utilities incur to serve their customers is the cost of restoring their systems after storms. The legislature has authorized utilities to establish reserves that essentially operate as "self-insurance" funds for this type of expense. PURA section 36.064 authorizes an electric utility to self-insure all or part of its potential liability or catastrophic property loss "that could not have been reasonably anticipated and included under operating and maintenance expenses." Tex. Util. Code Ann. § 36.064(a). The utility may recover reasonable contributions to the reserve through its rates as a necessary expense. *See id.* § 36.064(c). Once the reserve is established, a surplus exists if the charges against the account are less than the amount ratepayers have contributed to it. *Id.* § 36.064(e). Conversely, a shortage exists if the charges against the account are greater than the amount ratepayers have contributed to it. *Id.* Any surplus is subtracted from the utility's rate base, while any shortage is added to the utility's rate base. *Id.* § 36.064(d).

The Commission's Substantive Rule 25.231(b)(1)(G) mirrors PURA section 36.064 in these respects:

> The commission shall consider approval of a self insurance plan in a rate case in which expenses or rate base treatment are requested for such a plan. For purposes of this section, a self insurance plan is a plan providing for accruals to be credited to reserve accounts. The

24

reserve accounts are to be charged with property and liability losses which occur, and which could not have been reasonably anticipated and included in operating and maintenance expenses, and are not paid or reimbursed by commercial insurance….

\*\*\*

If a self insurance plan is approved by the commission, any shortages to the reserve account will be an increase to the rate base and any surpluses will be a decrease to the rate base. The electric utility shall maintain appropriate books and records to permit the commission to properly review all charges to the reserve account and determine whether the charges being booked to the reserve account are reasonable and correct.

16 Tex. Admin. Code § 25.231(b)(1)(G) & (c)(2)(E).

Consistent with these provisions, ETI maintains a storm reserve. As of June 30, 1996, ETI had a surplus reserve balance of $12,074,581.[28] From that date through the end of the test year in this case, ETI charged $101,670,803 to the reserve related to more than 200 storms, including $13,014,379 for damage caused by a 1997 ice storm alone. However, ETI accrued only $29,796,478 through base rates.[29] Thus, at the end of the test year for this case, ETI had a *shortage* of $59,799,744 in its reserve.[30] ETI sought permission to recover about $4 million each year going forward for future storms, plus $3.87 million per year for 20 years

---

[28] AR Part II, Binder 39, OPC Exh. 6 (Benedict Direct at 7 & Exh. NAB-1 at 2) (ETI's response to Cities RFI 6-2(a)).
[29] *Id*.
[30] *Id*. at 7; AR Part II, Binders 21-30, ETI Exh. 3 (Vol. Sched_1 at Sch. B-1, line 7; Sch. WP_B-1, p. 7); AR Part II, Binder 32, ETI Exh. 14 (Wilson Direct at 11).

25

to eliminate the shortage and establish a positive target reserve of $17.595 million.[31]

OPUC opposed this request, arguing that the Commission had previously found that ETI's past vegetation management practices exacerbated the 1997 ice storm damage. OPUC also argued that ETI had not made a *prima facie* showing that any of the storm costs incurred since 1996 were reasonable and necessary.[32] The ALJs, however, expressly found that ETI established that its storm costs, including the ones associated with the 1997 ice storm, were reasonable and necessary.[33] The ALJs concluded that all the costs were properly charged against the storm reserve, and recommended that OPUC's proposed adjustment be denied.[34] The Commission adopted that recommendation, finding that:

47. ETI established a prima facie case concerning the prudence of its storm damage expenses incurred since 1996.

48. Adjustments to the storm damage reserve balance proposed by intervenors should be denied.

***

50. ETI's appropriate Test-Year-end storm reserve balance was negative $59,799,744.[35]

---

[31] AR Part II, Binder 32, ETI Exh. 14 (Wilson Direct at 5); AR Part II, Binder 39, OPC Exh. 6 (Benedict Direct at 7).
[32] AR Part I, Binder 5, Item 185 (Proposal for Decision at 49 & 56).
[33] *Id.* at 56 & 57.
[34] *Id.* at 57.
[35] AR Part I, Binder 7, Item 244 (Order on Rehearing at 1 & FOFs 47, 48, & 50).

OPUC sought judicial review of that decision,[36] but the district court affirmed it.[37] OPUC appeals the district court's judgment only insofar as it pertains to the 1997 ice storm costs.[38]

ETI disputes OPUC's Statement of Facts in several respects. It is generally lopsided and omits critical facts. For instance, OPUC alleges that the Commission did not make "required" findings about the prudence of ETI's 1997 ice storm costs. However, as noted above, the Commission expressly found that ETI had established a *prima facie* case that all of its storm restoration costs were prudently incurred, that OPUC's proposed disallowance should not be made, and that ETI's storm balance should be set at negative $59,799,744 million.[39]

OPUC also says that the Company did not provide an "affirmative case" supporting the prudence of its 1997 ice storm costs. That is not so; ETI details its evidence below in the context of addressing OPUC's argument. Moreover, largely relying upon statements the Commission made in Docket No. 18249 about the Company's quality of service, OPUC suggests that the Commission has already

---

[36] CR 61 (OPUC's Plea in Intervention). OPUC's petition seeking judicial review of the PUCT's decision was originally assigned Cause No. D-1-GN-13-000179. That cause was consolidated into this one. CR 82. OPUC's petition has not yet been included in the Clerk's Record of this cause.

[37] CR 2118.

[38] CR 2126. Though OPUC did not limit the scope of its appeal to the 1997 ice storm costs in its Notice of Appeal, OPUC has so limited its appeal to the issue of the 1997 ice storm costs by briefing only that issue to this Court. *E.g., Nall v. Plunkett,* 404 S.W.3d 552, 556-57 (Tex. 2013).

[39] AR Part I, Binder 7, Item 244 (Order on Rehearing FOFs 47, 48, & 50).

27

determined that some unquantified fraction of the $13 million in costs related to the 1997 ice storm were imprudently incurred. As ETI details below, the prudence of ETI's actual costs to repair the 1997 ice storm damage was not within the scope of or adjudicated in that docket. OPUC also suggests that the ALJs in the proceeding underlying this appeal deemed the costs prudent solely because the passage of time has made scrutiny difficult. But the ALJs expressly relied upon evidence adduced in this proceeding to support their decision that the costs were prudently incurred.[40] OPUC's Statement of Facts simply does not fairly represent the evidence presented, or the bases for the Commission's decision, in this case.

## II.  SUMMARY OF ARGUMENT

OPUC argues that the Commission erred in allowing ETI to recover the costs it incurred to restore its system after the 1997 ice storm because the costs were somehow deemed imprudent in a prior docket, and because ETI did not present enough proof in this docket to convince OPUC of their reasonableness and necessity. The Commission, however, has never determined that these costs were imprudently incurred. In fact, though the Commission penalized ETI for certain quality of service issues in a prior docket, the Commission expressly reserved for a future rate case the question of whether these particular costs were prudently incurred. The Commission addressed that issue in this case.

---

[40] AR Part I, Binder 5, Item 185 (Proposal for Decision at 53).

Contrary to OPUC's argument, ETI presented proof in this case that all of its 1997 ice storm costs were prudently incurred. ETI not only established the reasonableness of its storm preparedness and restoration processes in general, but also specifically established the reasonableness of its restoration efforts and costs related to the 1997 ice storm. OPUC, on the other hand, did not present any evidence that any particular cost was imprudently incurred. Instead of doing that, OPUC made the strategic decision to argue that ETI did not make out a *prima facie* case of prudence. Both the ALJs and the Commission were convinced on this record that ETI prudently incurred these costs. The Commission's decision is reasonably supported by the record, and this Court should not accept OPUC's invitation to re-weigh the evidence.

If (and only if) the Court disagrees that the evidence admitted in the record is sufficient to establish prudence, the Court should address ETI's conditional cross-point on the exclusion of additional evidence of prudence. ETI presented detailed evidence of the specific costs it incurred, in the form of a 420-page spreadsheet. The Commission erroneously declined to admit this evidence in the record on the ground that ETI did not "reserve" its right to offer the spreadsheet when OPUC offered an excerpt of the document through its own witness. The rule of optional completeness, upon which the Commission relied, does not require such a reservation. The Commission, therefore, erred as a matter of law in failing

29

to admit the entirety of the document in evidence when ETI offered it. The record reasonably supports the Commission's determination of prudence in this case with and without the spreadsheet.

## III. ARGUMENT AND AUTHORITIES

OPUC generally contends the Commission committed "legal error" by including the $13,014,379 in expenses ETI incurred as a result of the 1997 ice storm. OPUC frames the issue in multiple ways. OPUC says the Commission violated PURA's requirement that expenses be reasonable and necessary and the Commission's parallel requirement in its cost-of-service rule. OPUC further contends the Commission violated the requirement in PURA and the Commission's cost-of-service rule that charges against a storm reserve are limited to those that "could not have been reasonably anticipated." OPUC also says the Commission relieved the Company of its burden of proof because of the passage of time, and that the Commission erred by considering the purportedly irrelevant fact that ETI had already been penalized for past service quality issues via a reduced rate of return on equity. All of these formulations of the argument hinge on two premises: (1) that the Commission determined, in its previous Docket No. 18249, that some of ETI's $13 million in 1997 ice storm costs were imprudently incurred and (2) that ETI presented no evidence demonstrating the reasonableness and

necessity of the $13 million in costs associated with the 1997 ice storm. Both premises are wrong.

## A. The Commission did not address the prudence of ETI's 1997 ice storm restoration costs in Docket No. 18249.

OPUC does not accurately characterize what happened in Docket No. 18249. Docket No. 18249 was not addressed to the rate recovery of storm restoration or any other investment, and was not the result of the 1997 ice storm. Rather, it was the result of a January 24, 1997, preliminary order in Docket No. 16705, which was a rate case filed in November 1996.[41] The preliminary order directed that Docket No. 16705 "address specific service quality standards that will apply after the transition [proposed by one of ETI's predecessors].[42] The Commission was interested in investigating a range of service quality issues since the merger of Gulf States Utilities, Inc. and Entergy Corporation in 1993.[43]

The Commission expanded the scope of its service quality investigation in a March 7, 1997, supplemental preliminary order, which delineated three questions to address: "(1) Whether EGS [the predecessor to ETI] has an effective and prudent management policy in place that devotes sufficient resources to ensure adequate and reliable service to its ratepayers; (2) Whether there appear patterns of

---

[41] *See Entergy Gulf States, Inc. Service Quality Issues Severed From Docket No. 16705*, Docket No. 18249 (Order on Rehearing at FOF 2, Apr. 22, 1998).
[42] *Id.*
[43] *Id.* at 1.

variable service quality in EGS' service territory, and if so, what is the cause and potential resolution of these variations; [and] (3) Whether the Commission should implement procedures, and if so, what procedures can it implement, to monitor service quality on EGS' system, and to respond to situations in which EGS' service quality falls below the benchmark levels."[44]

At a November 4, 1997, open meeting, the Commissioners voted to sever the service quality issues from the Docket No. 16705 rate case and to hear and resolve the issues at the Commission level.[45] Hearings were conducted on November 20 and 21, 1997.[46] Those hearings culminated in the April 22, 1998, Order on Rehearing addressing service quality issues, including management structure, the transmission system, the distribution system and the pole inspection program, data collection, vegetation management, emergency preparedness, personnel levels, management practices, spending levels, and customer service.[47]

A small portion of the 54-page Order on Rehearing is devoted to the 1997 ice storm.[48] The Commission did find that ETI's service quality issues contributed to the extent of the 1997 ice storm damage.[49] But the Commission also acknowledged that it is uneconomic to build a storm-proof system, the severe ice

---

[44] *Id.* at FOF 3.
[45] *Id.* at FOF 5.
[46] *Id.* at FOF 7.
[47] *Id.* at 7-27.
[48] *Id.* at 17-19.
[49] *See id.* at FOFs 97-98.

32

storm impacted most utilities in Texas, and significant damage would have occurred even with exemplary vegetation management and other preventative measures.[50]

More importantly, the Commission left the consideration of the prudence of actual expenditures open for a future rate case. There is not a single statement in the Order on Rehearing in Docket No. 18249 that addresses the prudence of the 1997 ice storm costs or concludes that any portion of the costs should be disallowed. Rather, the Commission concluded that the Company's service quality needed improvement.[51] Accordingly, the Commission imposed a number of remedies, including a reduction in the Company's return on equity, system reliability targets, performance benchmarks, a quality assurance requirement, and a customer information and notification requirement.[52] Though the Commission did many things in Docket No. 18249, including penalize the Company for past service quality issues, it did not address recovery of or disallow any expenses that the Company incurred in restoring the system after the 1997 ice storm. Neither the prudence of storm restoration expenditures, nor, indeed, the prudence of *any* particular expenditure, was within the scope of Docket No. 18249. In fact, as OPUC acknowledges, the Commission months later expressly acknowledged that

---

[50] *Id.* at 18 & FOFs 90 & 99.
[51] *Id.* at 28.
[52] *Id.*

33

the prudence of the Company's 1997 ice storm costs would be addressed in a future rate case.[53]

OPUC essentially argues that the Commission's findings regarding the ice storm in Docket No. 18249 estop the Commission from doing anything but ordering a disallowance for imprudence in this case, regardless of the facts examined in this docket. To invoke the doctrine of collateral estoppel, however, a party must establish, *inter alia*: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; and (2) those facts were essential to the judgment in the first action. *E.g., El Paso Elec. Co. v. Public Util. Comm'n of Tex.,* 917 S.W.2d 846, 859 (Tex. App. – Austin 1995, writ dism'd by agr.) (citing *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex. 1984)). Again, none of the actual expenditures ETI incurred to restore its system after the 1997 ice storm were at issue in Docket No. 18249. They certainly were not "fully and fairly litigated" in that docket. Moreover, a determination of the prudence of those particular expenditures was not essential to the Commission's decision in Docket No. 18249. That docket concerned ETI's overall service quality, not its rates. Docket No. 18249 was not initiated or adjudicated under PURA's

---

[53] *Application of Entergy Gulf States, Inc. for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Unrecovered Fuel Costs,* Docket No. 16705 (Sept. 4, 1998, Order on Rehearing at FOF 147).

ratemaking provisions. Rather, the Commission created the docket as an exercise of its supervisory powers over ETI's services.

This Court rejected an argument similar to OPUC's in *El Paso Elec. Co. v. Public Util. Comm'n of Tex., supra.* There, the Commission, in previous dockets, had declined to allow El Paso Electric to include in rates a return on its "construction work in progress" ("CWIP") investment in its Palo Verde Plant Units 1 and 2 while those units were under construction. When El Paso Electric later sought to include its investment in Unit 3 in rates after the completion of that unit's construction, the utility's opponents argued that because the Commission had already determined the utility's continued participation in the Palo Verde project was imprudent, the Commission was bound by that determination and could not later reach a different conclusion in adjudicating the prudence of the Unit 3 costs.

The Court rejected that argument because, although the prior cases had addressed prudence in association with the same construction project, they did not involve litigation of the specific aspect of the project (the prudence of Palo Verde Unit 3) that was the topic of the later case. In addition, the Court found application of collateral estoppel inappropriate because it was "ambiguous" whether the imprudence findings in the prior case were essential to the resolution of the case. *El Paso Elec. Co.,* 917 S.W.2d at 859-60. Here, there was likewise no indication in Docket No. 18249 that the prudence of any storm restoration cost was litigated.

35

There was no adjudication of cost-recovery issues at all, much less one that was based upon imprudence. Moreover, the Commission's service quality remedies in Docket No. 18249 are based on a host of different considerations and conclusions, such that, as in the El Paso Electric decision, it is not clear that any of the findings on the 1997 ice storm were essential to the Commission's resolution of the case.[54]

For all these reasons, the decision in Docket No. 18249 did not bind the Commission to any particular result or analysis in this case. The Commission was free to evaluate the prudence of the Company's 1997 ice storm restoration costs based upon the evidence presented in this case alone.

### B.     The Commission's decision in this case is supported by substantial evidence.

OPUC repeatedly suggests in its brief that ETI did not in this case proffer sufficient evidence that it prudently incurred the over $13 million in expenses to restore its system after the 1997 ice storm, and that in authorizing recovery of the

---

[54] For all these reasons, ETI disagrees that the Commission's decision in Docket No. 18249 has any bearing on this case. But even assuming purely for the sake of argument that the Commission determined in the earlier docket that some unquantified portion of the restoration effort was imprudently caused by ETI, the issue cannot be parsed the way OPUC tries to parse it. To the extent Docket No. 18249 can be said to determine ETI was responsible in part for any 1997 ice storm damage, that docket necessarily also adjudicated the penalty for such responsibility. The Commission penalized ETI in Docket No. 18249 for any damages attributable to its service quality issues by reducing its return on equity. The Commission even made that penalty retroactive and required ETI to make refunds to customers. OPUC cannot cherry-pick findings from Docket No. 18249 and selectively apply collateral estoppel principles. Assuming arguendo that the Commission actually decided that ETI's pre-storm actions were "imprudent" in Docket No. 18249, and assuming *arguendo* that the decision was essential to the Commission's adjudication of the case, then the Commission actually adjudicated the remedy for that imprudence in that same docket. OPUC cannot take one finding, disregard the corresponding penalty, and seek a new penalty in this docket for the same conduct.

36

expenses, the Commission misapplied the burden of proof. This argument has no merit.

### 1. The Commission has formulated its own burden-shifting analysis for prudence reviews.

First, though OPUC recognizes the familiar principles that generally establish who has the burden of proof in a given case, OPUC ignores that the Commission has developed its own burden-shifting procedure for evaluating prudence reviews. The burden of production is initially on the utility to establish that its costs were prudently incurred, and a utility's costs are initially *presumed* to be prudent once the utility has presented a *prima facie* case in support of its application. *Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.,* 112 S.W.3d 208, 214-15 (Tex. App. – Austin 2003, pet. denied).[55] A utility may establish a *prima facie* case of prudence without proving the reasonableness and necessity of each separate act and each individual dollar paid on a granular level.[56] The Commission's formulation of the *prima facie* case requirement is:

> … crafted to accommodate the voluminous, highly technical evidence required to establish the prudence of investment in electric power plants. *The Commission's prima facie procedure allows the utility to*

[55] *See also Application of Texas Utils. Elec. Co. for Authority to Change Rates,* Docket No. 9300, 17 P.U.C. Bull. 2057, 2148 (Examiners' Report, Jun. 12, 1991) *adopted and incorporated* 17 P.U.C. Bull. 2825 (Order on Rehearing, Sept. 27, 1991); *Application of Entergy Gulf States Utils. Co. for Authority to Change Rates; Inquiry of the Public Util. Comm'n of Tex. into the Prudence and Efficiency of the Planning & Management of the River Bend Nuclear Generating Station,* Docket Nos. 7195 & 6755, 14 P.U.C. Bull. 1943, 1970 (Examiners' Report, Dec. 7, 1987) *adopted and incorporated* 14 P.U.C. Bull. 2384 (Order, May 16, 1988).
[56] *See* Docket Nos. 7195 & 6755, 14 P.U.C. Bull. at 1970.

*establish the prudence by introducing evidence that is comprehensive,*
*but short of proof of the prudence of every bolt, washer, pipe hanger,*
*cable tray, I-beam, or concrete pour.*

*Id.* at 215 n.5 (emphasis added). If the utility presents a *prima facie* case, the

burden of going forward (burden of production) shifts to the intervenors to present

evidence that reasonably challenges an expenditure.[57] Once the presumption is

rebutted, the burden falls on the utility to prove, by a preponderance of the

evidence, that the challenged expenditures were prudent. *Id.* at 215.

The Commission's procedure is not established by statute or dictated by

court decision, but instead specially crafted by the Commission to aid in the

efficient trial of issues just like the one before this Court. *Id.* at 215 n.5. To the

extent OPUC attempts to elevate the quantum of proof necessary to establish a

*prima facie* case in a utility prudence review, or to reduce the quantum of proof

necessary to rebut a utility's *prima facie* case, OPUC contravenes the

Commission's own long-standing precedent on these matters.

### 2. This Court may not second-guess the Commission's assessment of the weight of the evidence.

OPUC's arguments challenge the Commission's assessment of the parties'

evidence and invite the Court to assess it differently. That is, OPUC's arguments

about whether the evidence exceeds various thresholds imply that the Court is the

---

[57] *See* Docket No. 9300, 17 P.U.C. Bull. at 2148.

trier of fact on the prudence issue.[58]  But a court in a suit for judicial review of an agency order may not delve into weighing the evidence.  *See, e.g., Central Power & Light Co. v. Public Util. Comm'n of Tex.,* 36 S.W.3d 547, 561 (Tex. App. – Austin 2000, pet. denied) (agency is sole judge of weight to be accorded testimony of each witness).  Rather, in a suit like this, a court may determine only whether there is a reasonable basis in the record for the agency's decision.  In other words, even if the court would reach a conclusion different from the one the agency reached on the same record, the court must uphold the agency's decision if it is within the bounds of reasonableness.  *E.g., Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.,* 665 S.W.2d 446, 452-53 (Tex. 1984).

**3.    The record amply supports the reasonableness and necessity of ETI's costs of restoring its system after the 1997 ice storm.**

**a.    The Commission reasonably found that ETI made a *prima facie* case of prudence.**

As the ALJs recognized, ETI provided storm cost data accompanied by narrative testimony that supported the reasonableness of ETI's preparedness and restoration processes.[59]  For instance, ETI witness Shawn Corkran discussed ETI's distribution operations, industry-recognized comprehensive storm plans, annual

---

[58] *See Duval County Ranch Co. v. State*, 587 S.W.2d 436, 442 (Tex. Civ. App. – San Antonio 1979, writ ref'd n.r.e.), *cert denied,* 101 S.Ct. 856 (1981) (truth and weight of the evidence offered by a defendant tending to meet and overcome the *prima facie* evidence are questions to be resolved by the trier of fact); *Keystone Operating Co. v. Runge Indep. Sch. Dist.*, 558 S.W.2d 82, 84 (Tex. Civ. App. - San Antonio 1977, writ ref'd n. r. e.) (same).

[59] *See* AR Part I, Binder 5, Item 185 (Proposal for Decision at 50-57).

storm drills, storm response and restoration processes, distribution maintenance and asset improvement processes, service quality and continuous improvement programs, and vegetation management practices.[60] Mr. Corkran described how the Company prepares for emergency situations.[61] He explained how charges to the storm reserve are captured and recorded.[62] Finally, Mr. Corkran provided four exhibits demonstrating that, on both per-kWh and per-customer bases, ETI's distribution operation and maintenance costs compare very favorably to the costs of other utilities.[63] Because ETI carries out its distribution activities in the same efficient and cost-effective manner while performing routine activities as it does during storm restoration, those metrics and reliability statistics support the reasonableness of costs booked to the reserve. All of this testimony confirms that ETI has had processes in place to ensure its storm restoration costs are reasonable. This evidence supports a decision that all of ETI's historical storm costs were prudently incurred, including the costs of restoring the system after the 1997 ice storm.[64]

---

[60] AR Part II, Binder 33, ETI Ex. 25 (Corkran Direct).
[61] *Id*. at 28.
[62] *Id*. at 93.
[63] *Id.*, Exhibits SBC-2A, SBC-2B, SBC-2C, and SBC-2D.
[64] As the ALJ discussed in the PFD, the testimony of ETI witnesses Greg Wilson and Joseph Hunter further supports the reasonableness and necessity of all of ETI's storm restoration costs, including the 1997 ice storm costs. *See* AR Part I, Binder 5, Item 185 (Proposal for Decision at 50-52).

Furthermore, Mr. Corkran in his rebuttal testimony specifically addressed the restoration costs associated with the 1997 ice storm. Mr. Corkran, who worked for the Company as a crew guide during the 1997 restoration effort, described the severity of the storm and the area affected.[65] He detailed the work performed to restore the system, which included repairing 40,000 spans of damaged distribution lines.[66] He described how the accumulation of one to three inches of ice directly on the distribution lines caused many of the spans to collapse, without regard to damage from falling tree limbs.[67] Mr. Corkran described the Company's response to the damage, including hiring numerous contractors to assist with the restoration effort.[68] Mr. Corkran described how he evaluated the reasonableness of the costs that were incurred during the restoration effort. His evaluation was facilitated by his having directly participated in the restoration effort and through his experience in responding to numerous storm events and restorations.[69] Mr. Corkran described how the costs were recorded on the Company's books, and he explained in detail every category of costs included in the $13,014,379.[70]

Despite this evidence, OPUC insists that the Commission could not reasonably find that the costs charged against its storm reserve could not

---

[65] AR Part II, Binder 37, ETI Exh. 48 (Corkran Rebuttal at 4).
[66] *Id*. at 5-6.
[67] *Id*. at 6-7.
[68] *Id*. at 7-9.
[69] *Id.* at 8, 11-12.
[70] *Id.* at 9-11 & Exh. SBC-R-1.

reasonably have been anticipated. ETI's witness Michael Considine clearly put this issue to rest on rebuttal:

> Q. MR. POUS AND OPUC WITNESS NATHAN BENEDICT BOTH SAY ETI SHOULD HAVE REASONABLY ANTICIPATED THESE STORM COSTS. DO YOU AGREE?
>
> A. No. As shown on Exhibit MPC-R-3, the annual expenditures are extremely variable. Moreover, they are unpredictable as to timing. As such, the level of expenses could not reasonably be anticipated.[71]

The Commission agreed, finding that "ETI's appropriate Test-Year-end storm reserve balance was negative $59,799,744."[72] This finding confirms that the Commission considered whether the costs could reasonably have been anticipated. If ETI could reasonably have anticipated the costs, they could not "appropriately" be charged against the storm reserve. The Commission was well within its discretion to credit ETI's testimony. That the Commission weighed the evidence differently from the way OPUC would have preferred is not error, much less reversible error.

### b. The Commission reasonably declined to make the disallowances that OPUC proposed.

The Commission reasonably concluded that OPUC's evidence did not outweigh ETI's. Although the burden of production shifted to OPUC as a result of ETI's *prima facie* showing, OPUC did not challenge any specific charges to ETI's

---

[71] AR Part II, Binder 37, ETI Exh. 46 (Considine Rebuttal at 29).
[72] AR Part I, Binder 7, Item 244 (Order on Rehearing at FOF 50).

storm reserve. OPUC did not ask any discovery questions regarding ETI's storm reserve.[73] OPUC did not depose any witnesses regarding ETI's storm reserve.[74] OPUC's witness did not even read, much less analyze, Mr. Corkran's testimony.[75] In short, as recognized in the ALJs' proposal for decision, OPUC failed to demonstrate that specific expenditures were imprudently or unreasonably made and, instead, relied solely upon its insistence that ETI failed to make a *prima facie* case.[76]

Nevertheless, OPUC attempts to rely upon its witness Mr. Benedict's testimony to establish that its evidence outweighed ETI's. However, Mr. Benedict's testimony is comprised of summaries and unsupported allegations. It is not persuasive or probative evidence. Mr. Benedict claimed that charges to ETI's storm reserve are inherently suspect based on the Commission's criticism of ETI's service quality sixteen years ago in Docket No. 18249.[77] But again, Mr. Benedict later admitted that he did not read or analyze ETI's testimony regarding service quality.[78]

Finally, in response to a discovery request from Cities, ETI provided an extensive amount of storm reserve data at the most granular level. This data

---

[73] AR Part III, Binder 43, Vol. K (May 2, 2012, Transcript at 1707).
[74] *Id.*
[75] *Id.* at 1701-09.
[76] AR Part I, Binder 5, Item 185 (Proposal for Decision at 54).
[77] AR Part II, Binder 39, OPC Exh. 6 (Benedict Direct at 10-12).
[78] AR Part III, Binder 43, Vol. K (May 2, 2012, Transcript at 1701-02 & 1707-08).

provided a basis for any interested party, including OPUC, to investigate the reasonableness of any particular storm response or expenditure booked to the reserve. Mr. Benedict acknowledged on the record that ETI provided 420 pages and over 22,220 lines of detail reflecting every single charge to the storm reserve over the last 15 years.[79] He conceded that for each of the roughly 22,200 charges recorded, the Company specified the month, year, state, project code, work order type, function, storm name, account number, resource code, resource code description, and amount.[80] Mr. Benedict received the document, and OPUC had plenty of information in its hands to scrutinize ETI's claims of prudence.[81] OPUC simply declined to use the information, opting instead to gamble on the possibility that the Commission might determine ETI had failed to make out a *prima facie* case.

In sum, neither OPUC nor this Court should delve into a re-weighing of the evidence. The Commission's weighing is dispositive if any evidence reasonably supports it. The Commission's findings that ETI established the prudence of all of its storm restoration costs, and that OPUC's proposed disallowances should be rejected, are supported by substantial evidence in the record. The ALJs' observations that the passage of time renders the analysis challenging, and that ETI

---

[79] *Id*. at 1703-1704.
[80] *Id*. at 1704.
[81] AR Part I, Binder 5, Item 185 (Proposal for Decision at 53-54).

has in the past been penalized for service quality issues, do not negate ETI's evidence or the fact that no intervenor convincingly refuted it. OPUC's argument to the contrary should be rejected.

      **c.**    *Conditional Cross-Point*:   **The Commission erred as a matter of law in denying ETI's request to admit a comprehensive spreadsheet of historical storm restoration costs in evidence.**

ETI presented abundant evidence that supports the Commission's conclusion that the ETI prudently spent over $13 million to restore its system after the 1997 ice storm. However, in the event the Court disagrees, ETI requests the Court consider the Commission's decision to exclude the additional and substantial evidence that ETI presented.

As noted above, ETI in discovery provided intervenors with a 420-page spreadsheet that listed every single storm restoration expense charged against its reserve and comprising the entire $102 million at issue. The spreadsheet gave detailed information about all the expenses. OPUC's witness Mr. Benedict attached several pages of that spreadsheet as an exhibit to his direct testimony, which was admitted in evidence at the hearing.[82] In cross-examining Mr. Benedict at the hearing, ETI offered the entire spreadsheet in evidence under the rule of

---

[82] AR Part III, Binder 43, Vol. K (May 2, 2012, Transcript 1688-89) (admitting Benedict Direct, including Exh. NAB-1).

optional completeness.[83] The ALJs refused to admit the exhibit on the ground that ETI had not "reserved" its right to make the offer when Mr. Benedict's direct testimony was admitted in evidence.[84] ETI made an offer of proof including the entire spreadsheet.[85] ETI pointed out the ALJs' error in its reply to OPUC's motion for rehearing,[86] but the Commission did not change the ALJs' evidentiary ruling.

The Commission erred in excluding the spreadsheet from evidence. The rule of optional completeness does not require that a party reserve its rights under the rule at the time the party's opponent offers an excerpt from a document. *See* Tex. R. Evid. 107. Even the related rule regarding "Remainder of or Related Writings or Recorded Statements," which does include language about timing, has been held *not* to require a party to offer the whole at the time the party's opponent offers the part. *See Gilmore v. State,* 744 S.W.2d 630, 631 (Tex. App. – Dallas 1987, pet. ref'd). The *Gilmore* court noted that the rule before it was a "narrow modification of the doctrine of optional completeness" and held:

> this rule does not in any way circumscribe the right of a party to develop fully the matter on cross-examination or as part of his own

---

[83] *Id*. at 1704-05.

[84] *Id.* at 1706.

[85] AR Part II, Binder 43, OOP 1 (ETI Exh. 103); AR Part III, Binder 43, Vol. L (May 3, 2012 Transcript at 1858-59).

[86] AR Part I, Binder 7, Items 242 & 250 (ETI's Reply to Motions for Rehearing at 8 n.30, incorporated into ETI's Reply to Second Motions for Rehearing at 8 n.30). Obviously, the error in excluding evidence did not prejudice ETI at the agency level, given the Commission's ultimate resolution of the storm reserve issue.

46

case. Since it is a permissive grant, not a requirement, the adversary may introduce the remainder evidence contemporaneously with the presentation of the incomplete evidence, he can wait to do so during cross-examination, or during the development of his own case.

*Gilmore*, 744 S.W.2d at 631. ETI properly sought to introduce the entirety of the spreadsheet in ETI's cross-examination of Mr. Benedict. Furthermore, there can be no credible argument that the ALJs or parties were prejudiced by the timing of ETI's request to admit the entire spreadsheet just minutes after OPUC admitted five of the spreadsheet pages. The Commission abused its discretion, acted arbitrarily and capriciously, and committed error of law in excluding ETI's spreadsheet evidence.

Again, the Commission's decision on the 1997 ice storm restoration costs is supported by record evidence. But if (and only if) this Court considers the Commission's order to be unsupported by the evidence that is in the record, ETI will be substantially prejudiced by the Commission's erroneous evidentiary ruling, and this Court should reverse it.

## **CONCLUSION AND PRAYER**

For all these reasons, Entergy Texas, Inc. respectfully requests this Court:

- affirm the district court's judgment insofar as it reverses the Public Utility Commission's order on fuel expenses and

- affirm the district court's judgment insofar as it upholds the Commission's order on storm costs or, alternatively, remand the issue for reconsideration of all the admissible evidence.

47

ETI further requests the relief it requested in its initial brief, costs of court, and any other relief to which it may show itself justly entitled.

Respectfully submitted,

*/s/ Marnie A. McCormick*
John F. Williams
State Bar No. 21554100
Marnie A. McCormick
State Bar No. 00794264
mmccormick@dwmrlaw.com
**DUGGINS WREN MANN & ROMERO, LLP**
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 *fax*

**ATTORNEYS FOR**
**ENTERGY TEXAS, INC.**

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 11,363 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word-processing software.

*/s/ Marnie A. McCormick*
Marnie A. McCormick

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties via electronic service on the 30th day of April, 2015:

Elizabeth R. B. Sterling
Environmental Protection Division
Office of the Attorney General
P. O. Box 12548 (MC 066)
Austin TX  78711-2548
*Counsel for Appellee Public Utility Commission of Texas*

Rex D. VanMiddlesworth
Benjamin Hallmark
Thompson Knight LLP
98 San Jacinto Blvd., Ste. 1900
Austin TX  78701
*Counsel for Intervenor Texas Industrial Energy Consumers*

Susan M. Kelley (retired)[87]
Administrative Law Division
Office of the Attorney General
P. O. Box 12548
Austin TX  78711-2548
*Counsel for Intervenor State Agencies*

Sara Ferris
Office of Public Utility Counsel
1701 N. Congress Ave., Ste. 9-180
P. O. Box 12397
Austin TX  78711-2397
*Counsel for Intervenor Office of Public Utility Counsel*

Daniel J. Lawton
LAWTON LAW FIRM PC
12600 Hill Country Blvd., Ste. R-275
Austin TX  78738
*Counsel for Cities of Anahuac, et al.*

*/s/ Marnie A. McCormick*
Marnie A. McCormick

---

[87] State Agencies have not yet appeared or designated a new lead counsel in this appeal.